UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2025 NOV 20   PM 3: 04**

CLERK

BY _____

DEPUTY CLERK

| | |
|---|---|
| MANSFIELD HELIFLIGHT, INC. ERIC D. CHASE, )<br><br>Plaintiffs, )<br><br>v. )<br><br>NICHOLAS R. LONGO, in his official capacity as Director of Aviation for the City of Burlington and his individual capacity; DAVID E. CARMAN, in his official capacity as Deputy Director of Aviation for the City of Burlington and his individual capacity; CITY OF BURLINGTON; JOHN DOES ONE, TWO, THREE, ETC. )<br><br>Defendants. ) | Case No. 2:25-cv-00388-cr |

## OPINION AND ORDER
## DENYING DEFENDANTS' MOTION TO DISMISS OR STAY PROCEEDINGS
### (Doc. 12)

On April 14, 2025, Mansfield Heliflight, Inc. ("MHI") and its owner, Eric Chase (collectively, "Plaintiffs"), brought this action against Nicholas Longo, the Director of Aviation at the Partick Leahy Burlington International Airport ("BTV"), in his official and individual capacity; David Carman, the Deputy Director of Aviation at BTV, in his official and individual capacity; the City of Burlington, Vermont; and John Doe defendants (collectively, "Defendants"). (Doc. 1.) On June 6, 2025, Defendants moved to dismiss or stay the proceedings. (Doc. 12.) On June 26, 2025, Plaintiffs opposed the motion. (Doc. 13.) Defendants did not file a reply.

Plaintiffs are represented by Christopher A. Duggan, Esq., Milton R. Goldberg, Esq., and Steven J. Watson, Esq. Defendants are represented by Pietro J. Lynn, Esq.

## I.   Factual and Procedural Background.

### A.   Allegations in the Complaint.

This action arises out of a dispute between Defendants and Plaintiffs regarding a May 1, 2017 lease agreement (the "Lease") for certain real property located at BTV which Plaintiffs contend the City breached. MHI is a certified Air Carrier whose operations include air taxi services, a flight school, and aircraft sales and maintenance. MHI owns numerous aircraft, including a Bombardier Global 6000 jet that weighs approximately 49,820 pounds and is valued at approximately $20 million. The Lease is for real property located at the South Hangar and undeveloped land located at 240 Valley Road, South Burlington (the "Leased Premises") for a period of five years. It began on May 1, 2017, and provided MHI an option to renew for an additional five-year period. After taking possession of the Leased Premises, MHI entered into subleases with Mansfield Aviation International, Mansfield Heliflight International, Green Mountain Flight Academy, Green Mountain Cover Crops, Bradford Worthen, Andy Strickler, James Gamble, and Chris Weinberg (collectively, the "Subletters").

In mid-April 2021, Beta Technologies, Inc. ("Beta"), an aerospace manufacturer that develops electric vertical and conventional takeoff and landing aircraft, proposed purchasing MHI's Lease. Beta told MHI it "wanted to work with MHI before 'pursuing other options[,]'" and made an offer for MHI "to completely sell its rights and assign the entire leasehold over to Beta." (Doc. 1 at 7, ¶ 33.) Because MHI had planned to renew its lease for five years, MHI made a counteroffer. Beta "revised" that counteroffer and proposed its own. *Id.* at ¶ 34. Neither party accepted the other's counteroffer, and MHI did not sell, assign, or otherwise transfer its Lease. Shortly thereafter, on April 26, 2021, MHI sent an email to Eugene Richards, the BTV Director of Aviation at the time, advising him that MHI intended to exercise its option to renew the Lease for the additional five-year term.

On November 8, 2021, the Burlington City Council (the "Council"), "pursuant to the City's Beta Expansion Initiative[,]" approved the issuance of a license agreement between the City and Beta "for work on [BTV] in a section known as 'the Valley.'" *Id.* at

2

8, ¶ 38. After the City entered into the license agreement with Beta, Plaintiffs claim "MHI and other general aviation entities publicly criticized the manner in which the City was exhibiting undue favoritism towards Beta [] in a manner that was going to displace MHI and other general aviation companies from the restricted space available for general aviation activities at [BTV]." *Id.* at 10, ¶ 40.

On December 20, 2021, VTDigger, an independent news organization, published an article titled "As Beta expands, other Burlington Airport tenants worry they'll be boxed out[.]" The article, in relevant part, states:

> The tenants [of BTV] — all of whom work in "general aviation," the sector of flying that includes charters, flight schools and private planes — say they have no bone to pick with Beta, whose success they salute.
>
> But they do find fault with [BTV] for, in their eyes, not being transparent about how Beta's expansion could affect "The Valley," Burlington's hub for general aviation.
>
> Unease about [BTV]'s openness with tenants was on full display at [the Council] meeting last month, when some general aviation businesses told councilors they weren't made aware of whether an agreement between Beta and [BTV] would affect their leases.

*Id.* at ¶ 41 (quoting Jack Lyons, *As Beta expands, other Burlington Airport tenants worry they'll be boxed out*, VTDigger (Dec. 20, 2021, 4:20 PM), https://vtdigger.org/2021/12/20/as-beta-expands-other-burlington-airport-tenants-worry-theyll-be-boxed-out/). The article quotes Mr. Chase as follows:

> As [BTV] developed [a] master plan, [BTV] management sought input from the general aviation community, [Mr.] Longo said, but the businesses that are now pushing back against [BTV]'s decisions did not participate in the process.
>
> Yet Eric Chase, owner of [MHI], contends that [BTV] was never proactive in reaching out to his company.
>
> "They never called up and said, 'Hey, [MHI], how can we help you and how do you want to contribute to the master plan?' That's never happened," [Mr.] Chase said.
>
>            \*\*\*
>
> [Mr.] Longo said he is committed to maintaining a healthy general aviation community at [BTV].

> But [Mr.] Chase isn't so sure. The permits that Beta secured with South Burlington for its manufacturing facility show overlap with [MHI]'s current [L]ease, which doesn't lapse until 2027, he said.

> "We're still concerned that we're going to have to fight about it," [Mr.] Chase said. "We shouldn't have to fight about it. As far as we're concerned, we've already done everything that we were supposed to do."

> [Mr.] Chase said he'd be open to the possibility of renegotiating [MHI's] Lease with [BTV] if [Mr.] Longo asked him about it. But that step hasn't been taken yet, he said.

> "We're not opposed to negotiating or talking with people," [Mr.] Chase said. "But we're certainly opposed to people assuming our property."

*Id.* at 10-11, ¶¶ 42-43 (quoting Lyons, *supra*).

On December 20, 2021, the same day that VTDigger published its article, MHI "received notice from Assistant City Attorney, Timothy Devlin, that their lease would not be renewed upon its expiration [on] April 30, 2022."[1] (Doc. 1 at 12, ¶ 45) (citation omitted). Thereafter, Plaintiffs continued to oppose the City's actions at BTV in the press. Another VTDigger article, published on January 4, 2022, titled "Tenants decry Burlington Airport director's handling of Beta expansion" states, in relevant part:

> In a Monday interview with VTDigger, [Mr.] Longo said the Beta agreement was a factor in the termination of [MHI]'s existing [L]ease terms. For Beta to build a loading dock area for its manufacturing facility, it needs [MHI]'s parking lot, he said.

> On top of giving Beta more space, [Mr.] Longo said [MHI]'s "past payment history" was "a massive consideration in this lease negotiation."

> Eric Chase, the owner of [MHI], told VTDigger that his company received a default letter from [BTV] in 2020, because — according to [Mr.] Chase — [BTV] was unclear about whether [MHI] could get relief from its rent during the pandemic. The company eventually paid back [BTV], [Mr.] Chase said.

*Id.* at 11-12, ¶ 44 (quoting Jack Lyons, *Tenants decry Burlington Airport director's handling of Beta expansion*, VTDigger (Jan. 4, 2022, 5:57 PM), https://vtdigger.org/2022/01/04/tenants-decry-burlington-airport-directors-handling-of-

---

[1] It is unclear, from both the Complaint and the pleadings, whether the City sent notice of non-renewal before or after VTDigger published its December 20, 2021 article.

beta-expansion/).

On January 5, 2022, "Members of the General Aviation Community," including MHI and Mr. Chase, sent a letter to then City of Burlington Mayor, Miro Weinberger, and the Council regarding "the license agreement approved by the [Council] on November 8, 2021 between [Beta] and the City[.]" *Id.* at 12, ¶ 45 (internal quotation marks omitted). The letter provides:

> On Monday, December 20th, [MHI], one of the General Aviation tenants and current leaseholders of the Valley area at [BTV], received notice from Assistant City Attorney, Timothy Devlin, that their lease would not be renewed upon its expiration [on] April 30, 2022. The Assistant City Attorney offered that the city would be willing to enter into a new two[-]year lease with [MHI] but that the lease would not include the majority of the outdoor area and parking lot that is included in the current [L]ease.
>
> The action taken by the city is contrary to the assurances provided to the [C]ouncil by [Mr. Longo] on November 8th as well [as] the multiple verbal assurances that he provided to General Aviation tenants and stakeholders in meetings that took place after the November 8th [C]ouncil meeting.
>
> A number of other Valley tenants were recently offered lease extensions ranging from [two to five] years. While this represents progress and follows through on some of the assurances provided, the lease extensions are inconsistent from tenant to tenant. This raises the question of why certain tenants are being offered longer extensions than others and the potential of preferential treatment. The disparity also creates considerable suspicion as to whether [BTV] plans to turn areas that have only been granted a [two-]year extension over to Beta in the future. More importantly, none of the extensions provide sufficient certainty regarding any of the existing tenants' and business[es]' ability to continue to operate at [BTV] beyond a relatively short period of time. . . .
>
> Based on these facts, the [Beta] license agreement that was approved by the [C]ouncil appears to be one based on false pretenses. We respectfully request that the [C]ouncil take [specified] actions in order to maintain transparency in the dealings of a public airport and government body as well as to ensure that the public has sufficient input, as required by the [Federal Aviation Administration], in the [BTV] planning process . . . [including, without limitation, a prohibition against [BTV] terminating any of the leases of current aviation leaseholders of the Valley and [a requirement that BTV] offer a minimum of [five] years of lease extensions to these tenants.

*Id.* at 12-13, ¶ 45 (quoting Letter from Members of the General Aviation Community (Jan. 5, 2022)) (emphasis omitted).

In early January 2022, Mr. Chase "appeared on a local Channel 3 news broadcast to complain[] about how the City was allowing Beta to take over MHI's parking area space in a manner that would negatively impact MHI's future business plans." *Id.* at 13, ¶ 46. Plaintiffs allege that following the "exercise of their free speech rights to publicly criticize the City's Beta Expansion Initiative, [] Defendants reacted with a litany of acts designed to punish [them] for their public criticism." *Id.* at 14, ¶ 47.

On April 14, 2022, Jeff Glassberg, a real estate consultant for the City, allegedly sent an email to Mr. Longo and Assistant City Attorney, Timothy Devlin, stating that even "if MHI 'gets even a thirty[-]day extension, it has to include an agreement not to appeal. Otherwise, from the perspective of defending an appeal, we are better off if their [L]ease has expired and they have' no 'rights or tenure as a 'neighbor' to object to Beta's expansion at [BTV].'" (Doc. 1 at 15, ¶ 51) (alteration adopted). Plaintiff claims Mr. Glassberg's email stated that "[MHI] [does]n't get a [thirty-]day extension without the waiver of appeal. [MHI] [does]n't get a lease renewal without the waiver." *Id.* (internal quotation marks omitted.)

The following day, on April 15, 2022, the City sent MHI a proposed thirty-day lease extension to "extend the [L]ease from its expiration date until midnight on May 31, 2022[.]" *Id.* at 14, ¶ 49 (internal quotation marks omitted). The proposed thirty-day lease extension contained a non-opposition clause that states:

> **6. Non-Opposition.** [MHI] agrees not to contest, appear as an adverse party, or in any other manner oppose or appeal[] any application made by the City, its agents, or other tenants ("Lessor Affiliates") to any governmental or municipal entity, board, commission[,] or officer for improvements, alterations[,] or expansion of or to [BTV], including[,] without limitation, any application made by the City or Lessor Affiliates to the South Burlington zoning administrator, the South Burlington Development Review Board, the Vermont District Environmental Commission, or any other municipal or state regulatory body. Breach of this covenant shall be a material event of default under the Lease and cause for immediate termination.

*Id.* (emphasis in original).

Because MHI objected to the inclusion of the non-opposition clause, it did not sign the proposed thirty-day lease extension. The City nonetheless invoiced MHI for May 2022 rent even though the Lease, with the five-year extension option revoked, expired on April 30, 2022. MHI paid rent for May 2022, which the City accepted. MHI later sent a payment for June 2022 rent, but the City rejected and returned the payment because there was no invoice number associated with the payment. Plaintiffs allege "[t]his excuse was specious given that wire transfers previously submitted to the City by MHI rarely, if ever, made reference to an invoice number." *Id.* at 15, ¶ 53. They claim the payment was rejected because Mr. Longo decided the City should no longer accept MHI's payments.

Thereafter, in July 2022, Plaintiff alleges that the City sent MHI a revised thirty-day lease extension with a non-opposition clause that had a "harsher sanction if it was breached." *Id.* at 17, ¶ 59. The non-opposition clause remained in the new proposed extension, but it replaced the last sentence of the prior non-opposition clause as follows: "Breach of this covenant shall be a material event of default under the Agreement and cause for immediate termination without the opportunity to cure." (Doc. 1 at 17, ¶ 59) (emphasis omitted). Because MHI refused to sign a lease extension containing the non-opposition clause, and the City refused to enter a lease extension with MHI unless it agreed to the non-opposition clause, the parties did not enter an agreement.

On July 18, 2022, the City and Beta entered a seventy-five-year lease for property that included thirty-three thousand square feet of premises initially leased to MHI. On the same day, Mayor Weinberger allegedly sent the following email to Mr. Longo:

> I want to be clear that other than the emails below I know nothing about the current push to make a deal with [MHI] and this appears to be a very different direction than the last conversations I was involved with. My understanding was that negotiations with [MHI] had stalled and no further efforts were being made with them until after the Beta lease was resolved and we could take a fresh look at this.
>
> That is still where I am. I am not clear that [MHI] is a good long-term partner for [BTV], especially as I understood this parcel could be helpful in meeting our goals for [Burlington Technical Center].

7

*Id.* at 17, ¶ 58 (alteration adopted) (emphasis omitted).

On September 14, 2022, Mr. Longo was appointed Director of Aviation for the City. Shortly thereafter, on September 28, 2022, the City sent MHI a notice terminating the month-to-month tenancy that the City claimed MHI had been occupying the Leased Premises under after April 30, 2022. After sending the notice, Plaintiffs allege, "[u]pon information and belief, . . . the City contacted certain of the Subletters and offered to allow them to remain in the South Hangar with the City taking over as the landlord." *Id.* at 19, ¶ 73.

The termination notice demanded that MHI vacate the Leased Premises by October 31, 2022, and pay unpaid rent because it had not paid rent since June 2022, when the City rejected its rental payment. MHI alleges that after April 30, 2022, but before September 28, 2022, the City never provided notice that MHI was in default for failure to make rental payments nor demanded payment of overdue rent. On October 27, 2022, MHI paid its rental payments by wire transfer under protest for the months of June, July, August, September, and October. The City accepted the rental payments. These rental payments comprised the full amount of rent due for the Leased Premises even though Plaintiffs allege that they could not access the entire area because Beta occupied a portion of it. The following day, on October 28, 2022, MHI paid rent for the month of November totaling $17,112.85, which Plaintiffs claim was a "new monthly rent . . . dramatically higher than MHI's previous rent[]" that "could not be justified by the application of typical rent escalation methodologies such as the Consumer Price Index, was not derived through good faith negotiations, and was dramatically higher than rent increases being applied to other [BTV] tenants during the same timeframe." *Id.* at 19, ¶ 72.

On November 1, 2022, Plaintiffs assert that the City, through four employees and agents, including two police officers, "arrived at the South Hangar to forcibly eject MHI" and installed new locks on the South Hangar. *Id.* at 20, ¶ 74. The employees and agents provided MHI with a ten-day temporary access code and advised that the City would provide it with a new access code thereafter to remove personal property from the Leased Premises but not to conduct any business thereon. They "also threatened MHI that if it

8

did not remove its personal property, including airplanes and airplane components[,] within thirty (30) days, the City would dispose of MHI's property." *Id.* at 20, ¶ 76.

On November 10, 2022, MHI filed suit against the City and Beta in the Chittenden County Superior Court, *Mansfield Heliflight v. City of Burlington*, No. 22-CV-03976 (Vt. Super. Ct. Chittenden Cnty.) (the "State Case"). MHI remained on the Leased Premises until September 5, 2023.[2] On September 1, 2023, Mr. Carman emailed BTV personnel stating "[a]s of today, [MHI] in the Valley is no longer a tenant at BTV. They have until [m]idnight on Tuesday[,] September 5[,] to vacate all their property and belongings, after which time[] they will no[] longer have access to [BTV]." (Doc. 1 at 20, ¶ 79.)

Following its eviction from the Leased Premises, MHI's personal property, including the Bombardier Global 6000 jet and other aircraft, remained at BTV, and "the City proceeded to deny [Mr.] Chase the effective ability to utilize his [Secured Identification Display Area] access badge to enter secure portions of [BTV] that were needed for [Mr.] Chase to provide maintenance on his aircraft[.]" *Id.* at 21, ¶ 82. On November 8, 2023, Mr. Carman allegedly contacted a towing company and asked them to tow away a tug, a crane, and a fuel truck from the Leased Premises and "told the person picking the items up that they were abandoned by a flight school, but did not give him MHI's contact information. [He] then asked the tow truck driver if he could also dismantle and remove MHI['s] aircraft." *Id.* at ¶ 83. On November 16, 2023, Plaintiffs allege Mr. Carman "told BTV 'Airport Operations' that no [BTV] employees should 'be communicating with' MHI's principals." *Id.* at 20-21, ¶ 80.

In 2024, Plaintiffs claim the City "repeatedly threatened to seize and take ownership of MHI's aircraft at [BTV], including the [Bombardier] Global 600[0] jet and

---

[2] It is unclear, from both the Complaint and the pleadings, how and why MHI remained on the Leased Premises until September 5, 2023, and why it was forced to vacate on that date. In the State Case, the Superior Court entered a Stipulated Temporary Restraining Order on December 9, 2022, providing that MHI "will have access and possession of the South Hangar, other than those portions of the [Leased] Premises that have been leased to Beta [], in accordance with the terms of the Lease until at least March 31, 2023[.]" (Doc. 12-12 at 1, ¶ 1) (footnote omitted). The parties do not indicate whether the Superior Court extended the temporary restraining order or whether the parties agreed to an extension.

its Phenom Aircraft, improperly asserting that the aircraft were not airworthy or had been abandoned by MHI." *Id.* at 21, ¶ 84. On March 8, 2024, the City, through its counsel, notified MHI "'that the City intends to exercise its authority under V.S.A. § 222(a) to take custody of and remove the [] Bombardier Global 6000 [jet] . . . that has apparently been abandoned by' MHI and 'move it to outdoor locations on the [BTV] premises . . . and eventually sell it[.]'" *Id.* at 22, ¶ 91. Plaintiffs allege that MHI repeatedly informed the City that it had not abandoned its aircraft but "[t]hese threats were so serious that they forced MHI to remove the aircraft from BTV to avoid the City confiscating the aircraft." (Doc. 1 at 21, ¶ 84.)

Thereafter, the City allegedly ousted MHI from BTV. On March 19, 2024, the Vermont Chamber of Commerce informed MHI that the City had prohibited MHI from attending the Chamber's event which was to be held at a "public [BTV t]erminal." *Id.* at 23, ¶ 93.

In their Complaint, Plaintiffs assert three causes of action: violation of the First Amendment under 42 U.S.C. § 1983 (Count I); violation of the Vermont Constitution, Chapter I, Article 7 and Article 13 (Count II); and trespass to chattels (Count III).

On June 6, 2025, Defendants moved to dismiss or stay the proceedings due to the pendency of the State Case. Defendants contend that dismissal is appropriate under the *Colorado River* abstention doctrine because this action is parallel to the State Case and the *Colorado River* factors favor dismissal. In the alternative, Defendants argue that staying this action pending the resolution of the State Case is appropriate under the court's inherent authority because the "[i]nterests of comity, judicial efficiency, and the likelihood of a prompt disposition in the [State Case] strongly favor staying this case." (Doc. 12 at 4.) Plaintiffs counter that this action and the State Case are not parallel because the State Case claims "hav[e] nothing to do with" their claims in this action and the *Colorado River* factors weigh against abstention and a stay. (Doc. 13 at 2.)

## B.    The State Case.

On November 10, 2022, MHI filed the State Case and thereafter twice amended its Complaint. Its Second Amended Complaint (the "SAC") asserts the following causes of

10

action: declaratory judgment against the City (Count I); breach of contract against the City (Count II); breach of the implied covenant of good faith and fair dealing against the City (Count III); trespass against the City and Beta (Count IV); violation of 12 V.S.A. § 4911 against the City (Count V); tortious interference with contractual relations and/or prospective business opportunity against Beta (Count VI); and tortious interference with contractual relations against the City (Count VII).

On December 5, 2022, the City moved to dismiss the SAC based on MHI's failure to plausibly allege that the email exchange between MHI and Mr. Richards renewed the Lease for five years. The Superior Court agreed and granted dismissal of the declaratory judgment and breach of contract claims (Counts I and II) but denied dismissal of the remaining counts.

On May 1, 2023, Beta moved to dismiss MHI's tortious interference with contractual relations and/or prospective business opportunity claim (Count VI), which the Superior Court granted as to tortious interference with prospective business opportunity but denied as to tortious interference with contractual relations. On July 20, 2023, Beta moved for summary judgment on MHI's trespass claim against it (Count IV), which the Superior Court granted.

After the Superior Court's rulings, the claims that remain in the State Case are breach of the implied covenant of good faith and fair dealing against the City,[3] trespass against the City, violation of 12 V.S.A. § 4911 against the City, and tortious interference with contractual relations against Beta and the City.

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Although a federal district court has discretion to abstain from exercising its

---

[3] Under Vermont law, the implied covenant of good faith and fair dealing requires a contractual relationship as a condition precedent. *See McHugh v. Univ. of Vermont*, 758 F. Supp. 945, 953 (D. Vt. 1991), *aff'd*, 966 F.2d 67 (2d Cir. 1992) ("While Vermont recognizes a cause of action for breach of implied covenant to deal fairly where there is a contract, . . . 'in the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing.'") (alteration adopted) (citation omitted). This claim allegedly arises out of MHI's past contractual relationship with the City, not its Lease renewal.

11

federal jurisdiction, *see Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 99 (2d Cir. 2012), because abstention represents an "exception to a court's normal duty to adjudicate a controversy properly before it, the district court's discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved." *Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 116 (2d Cir. 1998) (internal quotation marks and citation omitted). If the facts of the case do not meet "traditional" abstention requirements, "there is little or no discretion to abstain[.]" *Id.*

"The rule is well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction[.]" *McClellan v. Carland*, 217 U.S. 268, 282 (1910). For this reason, "abstention is generally disfavored, and federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction." *Niagara Mohawk Power Corp.*, 673 F.3d at 100 (citation omitted). In other words, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).

**B.    Whether the Court Should Dismiss This Action Pursuant to the *Colorado River* Doctrine.**

Under the *Colorado River* abstention doctrine, in "'exceptional circumstances,' a federal court may abstain from exercising jurisdiction when parallel state-court litigation could result in 'comprehensive disposition of litigation' and abstention would conserve judicial resources[.]" *Niagara Mohawk Power Corp.*, 673 F.3d at 100 (quoting *Colo. River*, 424 U.S. at 813, 817-18). The *Colorado River* doctrine governs motions to stay as well as motions to dismiss because "a stay is as much a refusal to exercise federal jurisdiction as a dismissal." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983).

To determine whether to abstain from exercising jurisdiction under *Colorado River*, the Second Circuit follows a two-pronged approach. "[A] finding that the concurrent proceedings are 'parallel' is a necessary prerequisite to abstention under *Colorado River*." *Dittmer*, 146 F.3d at 118. "Suits are parallel when substantially the

12

same parties are contemporaneously litigating substantially the same issue in another forum." *Niagara Mohawk Power Corp.*, 673 F.3d at 100 (internal quotation marks and citation omitted). "[A]bsolute congruency is not necessary to support a finding of *Colorado River* parallelism," *Pabco Constr. Corp. v. Allegheny Millwork PBT*, 2013 WL 1499402, at *2 (S.D.N.Y. Apr. 10, 2013), and "[p]erfect symmetry of parties and issues is not required." *United States v. Blake*, 942 F. Supp. 2d 285, 297 (E.D.N.Y. 2013) (citation omitted) (alteration in original). Instead, the determination rests on whether there is a "substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Addison Cent. Sch. Dist. v. Monsanto Co.*, 2024 WL 4100279, at *4 (D. Vt. Sept. 6, 2024) (quoting *Day v. Union Mines Inc.*, 862 F.2d 652, 656 (7th Cir. 1988)) (internal quotation marks omitted).

If the proceedings are parallel, the second prong of the Second Circuit's analysis requires weighing the *Colorado River* factors:

> (1) [W]hether the controversy involves a res over which one of the courts has assumed jurisdiction []; (2) whether the federal forum is less inconvenient than the other for the parties []; (3) whether staying or dismissing the federal action will avoid piecemeal litigation []; (4) the order in which the actions were filed[] and whether proceedings have advanced more in one forum than in the other []; (5) whether federal law provides the rule of decision []; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights[.]

*Woodford v. Cmty. Action Agency of Greene Cnty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001) (alterations and internal quotation marks omitted) (citing *Colo. River*, 424 U.S. at 813, 817, 818; *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 22, 23, 25-27). "'[T]he vexatious or reactive nature of either the federal or the state litigation may [also] influence the decision whether to defer to a parallel state litigation under *Colorado River*.'" *Telesco v. Telesco Fuel & Masons' Materials, Inc.*, 765 F.2d 356, 363 (2d Cir. 1985) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 17 n.20).

In evaluating the *Colorado River* factors, the court's task is "not to find some substantial reason for the *exercise* of federal jurisdiction[,]" but, "rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,'

that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 25-26 (emphasis in original). "[N]one of the[] factors alone is necessarily determinative, but, instead, a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." *Niagara Mohawk Power Corp.*, 673 F.3d at 101 (internal quotation marks and citation omitted).

The court's analysis must not "rest on a mechanical checklist" but reflect a "careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16; *see also Telesco*, 765 F.2d at 362 (noting the "exceptional circumstances test" should "be applied in a pragmatic, flexible manner with a view to the realities of the case at hand") (internal quotation marks and citation omitted). "The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16. "Where a *Colorado River* factor is facially neutral, that is a basis for retaining jurisdiction, not for yielding it." *Niagara Mohawk Power Corp.*, 673 F.3d at 101 (internal quotation marks and citation omitted).

### 1.    Whether the State Case and this Action Are Parallel.

The State Case and this action involve overlapping but not identical parties. Defendants argue that the State Case and this action are parallel because "there is a substantial likelihood that the [State Case] will dispose of all claims in [this action,]" even though there is no First Amendment claim in the State Case. (Doc. 12 at 10.) Plaintiffs counter that there is no substantial likelihood that the State Case will dispose of the claims in this action because this action involves free speech claims and a trespass to chattels claim, which the State Case does not, and this action is not reliant upon the Superior Court's prior and future findings and rulings.

As a threshold requirement for a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must establish that there was state action. *See, e.g., Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is . . . required to show state action.") (internal

14

quotation marks and citations omitted). Here, the City, as a municipality, and Mr. Longo and Mr. Carman, as employees of the City, are state actors and subject to liability under § 1983. *See Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 200 (D. Vt. 2024) ("[M]unicipalities operate as state actors for constitutional purposes.") (citation omitted); *Gonzalez v. City of N.Y.*, 377 F. Supp. 3d 273, 284 (S.D.N.Y. 2019) ("Municipal employees . . . are state actors.") (citation omitted).

To establish a prima facie First Amendment retaliation claim, a plaintiff must next prove that (1) they engaged in speech or activity protected by the First Amendment, (2) the defendant's actions were motivated or substantially caused by plaintiff's exercise of that right, (3) and the defendant's actions effectively chilled the plaintiff's exercise of their First Amendment right.[4] *See Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021). Once a plaintiff satisfies the burden of proving a prima facie case, the burden shifts to the defendant to show a legitimate, non-retaliatory basis for their action. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). If a defendant does so, the burden returns to the plaintiff to show that the defendant's purported reason is pretextual. *Id.*

Defendants argue the issue of whether their actions were motivated by or substantially caused by Plaintiffs' exercise of protected speech "will heavily depend on findings in the [State C]ase, and may be disposed of altogether upon resolution of that case[,]" (Doc. 12 at 10), because "outstanding rulings" on whether MHI effectively renewed the Lease for the five-year period "must be decided in the [State C]ase before Plaintiffs can advance the theory that Defendants' conduct was motivated or substantially caused by the exercise of a constitutionally protected right." *Id.* at 11. However, as Plaintiffs point out, a determination that the City had a legitimate basis for not renewing the Lease does not mean, as a matter of law, that the City did not retaliate against

---

[4] Identical requirements apply to Plaintiffs' retaliation claim under the Vermont Constitution, Chapter I, Article 7 and Article 13. *See Berlickij v. Town of Castleton*, 248 F. Supp. 2d 335, 345 n.13 (D. Vt. 2003) ("For state law claims of retaliation . . . for engaging in protected activities, the Vermont Supreme Court has indicated that it would follow the analytical approach adopted by the United States Supreme Court in retaliation cases implicating rights protected by the United States Constitution.") (citations omitted).

Plaintiffs for their exercise of their First Amendment rights.

In their Complaint in this action, Plaintiffs allege Defendants engaged in numerous retaliatory actions against them, including, but not limited to, allegations that Defendants terminated Plaintiffs' option to renew the Lease for a five-year period, insisted they forfeit any right to appeal or publicly oppose Beta's expansion as a condition of the Lease renewal, charged them an unjustifiably high rate of rent for the month of November 2022, demanded no BTV employees communicate with them, and barred them from attending events at BTV. These claims do not depend on whether the Lease renewal was valid. As a result, a State Case finding that Defendants had a legitimate basis for terminating Plaintiffs' option to renew the Lease would not dispose of Plaintiffs' free speech claims in this action.

Defendants similarly claim that Plaintiffs' trespass to chattels claim "will depend on findings that the Superior Court makes in the [State C]ase as to whether Plaintiffs had renewed their lease, whether Defendants were in breach of that purported lease, and whether Defendants had a right to the property on the formerly [L]eased [P]remises." (Doc. 12 at 12.) Plaintiffs respond that Defendants' argument "fails to recognize the distinction between trespass to land, which is a claim Plaintiffs alleged that is properly before the state court, and trespass to chattels, which the Plaintiffs have only alleged in federal court." (Doc. 13 at 13.)

Vermont state courts generally follow the Restatement (Second) of Torts. *See Langlois v. Town of Proctor*, 2014 VT 130, ¶ 34, 198 Vt. 137, 154, 113 A.3d 44, 55 ("[W]hile [Vermont state courts] are not constrained to follow the Restatements, we have generally done so unless there is a strong rationale to the contrary.") (citations omitted). The Restatement identifies the essential elements of a trespass to chattels claim as follows: "(a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." Restatement (Second) of Torts § 217.

Although Defendants contend that the Superior Court has made rulings that would dispose of Plaintiffs' trespass to chattels claim, the Superior Court's conclusions are not controlling precedent, and the court cannot determine at this juncture whether res judicata

16

would apply. More importantly, the Superior Court's preliminary injunction ruling addressed the likelihood of success on the merits; it did not adjudicate whether a trespass to chattels took place. Because the Superior Court's rulings do not address whether Defendants could lawfully deny Plaintiffs access to their aircraft and personal property at the Leased Premises, it appears unlikely that the State Case will dispose of Plaintiffs' trespass to chattels claim. *Assuming arguendo* that Defendants are found not liable for trespass in the State Case because they had the privilege to reclaim the Leased Premises, a fact finder could still find that they did not have the right to deny Plaintiffs access to their personal property. *See Hopkin v. Goetz*, 326 A.2d 12, 14 (Vt. 1974) (finding that plaintiffs' "four or five day arrearage on rent in no way justified the conduct of the defendant in taking the property of the plaintiffs without notice").[5]

Because there is no substantial likelihood that the State Case will dispose of all of the claims in this action and because the parties in the two cases differ with no overlapping claims, under the *Colorado River* doctrine, the cases are not parallel.

## 2. The Res and Convenience of the Parties.

Although Defendants argue the State Case involves "issues related to real property," neither the State Case nor this case are in rem or quasi in rem proceedings, and neither court has assumed jurisdiction over a res. "[T]he absence of a res points toward exercise of federal jurisdiction." *Woodford*, 239 F.3d at 522 (alteration adopted) (internal quotation marks and citation omitted). Both courts are located in Burlington, Vermont,

---

[5] *See also Price v. Hoyle*, 368 N.Y.S.2d 126, 129 (Co. Ct. 1975) (holding that regardless of whether the tenant abandoned the property or failed to pay rent, "the [landlords] have no right what[so]ever to the [tenant]'s personal property[]"); *Mason v. Schumacher*, 439 N.W.2d 61, 71 (Neb. 1989) ("When a landlord completely dispossesses a tenant of leased premises and either denies the tenant access to the tenant's personal property or asserts an interest in the tenant's property, an action for conversion will lie.") (citations omitted); *Clark v. Serv. Auto Co.*, 108 So. 704, 708 (Miss. 1926) ("It is true . . . that, notwithstanding [the landlords] were lawfully in possession of the leased premises, they would be liable to [the tenant] for any unlawful conversion to their use of the personal property belonging to [the tenant] found by them on the leased premises."); *Providence Hill, LLC v. Ndzanga*, 2021 WL 2878836, at *5 (Ky. Ct. App. July 9, 2021) ("[A] lawful eviction does not protect a landlord from liability for conversion of a former tenant's personal property.") (citation omitted).

17

which also weighs against abstention because "where the federal court is just as convenient as the state court, that factor favors retention of the case in federal court."[6] *Vill. of Westfield v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999) (internal quotation marks and citation omitted).

### 3.    The Concerns of Piecemeal Litigation.

"Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Day*, 862 F.2d at 659 (alteration, internal quotation marks, and citation omitted). As the Supreme Court has explained:

> [S]ince a judgment by either court would ordinarily be res judicata in the other, the existence of such concurrent proceedings creates the serious potential for spawning an unseemly and destructive race to see which forum can resolve the same issues first[, which would be] prejudicial, to say the least, to the possibility of reasoned decision[-]making by either forum.

*Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 567-68 (1983). "[T]he primary context in which [the Second Circuit] ha[s] affirmed *Colorado River* abstention in order to avoid piecemeal adjudication has involved lawsuits that posed a risk of inconsistent outcomes not preventable by principles of res judicata and collateral estoppel." *Woodford*, 239 F.3d at 524. The likelihood of piecemeal litigation, however, is not dispositive. As the Second Circuit instructs:

> The district court called this factor "the paramount consideration in this case." Although avoidance of piecemeal litigation is indeed an important value, and although the parallel state and federal proceedings here present some risks that the district court correctly identified, the court erred in concluding that this factor outweighed the other *Colorado River* factors that militated against abstention. As we have explained, the primary context in which we have affirmed *Colorado River* abstention in order to avoid piecemeal adjudication has involved lawsuits that posed a risk of inconsistent outcomes not preventable by principles of res judicata and collateral estoppel. The classic example arises where all of the potentially

---

[6] Defendants point out that any appeals from the State Case would be held in Montpelier, Vermont, while any appeals from this case would be held in New York City. The court finds this difference immaterial. *See Addison Cent. Sch. Dist. v. Monsanto Co.*, 2024 WL 4100279, at \*6 n.10 (D. Vt. Sept. 6, 2024), *motion to certify appeal denied*, 2025 WL 26762 (D. Vt. Jan. 3, 2025).

> liable defendants are parties in one lawsuit, but in the other lawsuit, one
> defendant seeks a declaration of nonliability and the other potentially liable
> defendants are not parties.

*Niagara Mohawk Power Corp.*, 673 F.3d at 101-02 (citations omitted).

Defendants argue that "a refusal to abstain will necessarily force Defendants to relitigate or simultaneously litigate facts and causes of action that are already in front of the Superior Court[,]" and "if findings are made in one court, such will necessarily spawn litigation regarding claim and issue preclusion in the other." (Doc. 12 at 14.) A First Amendment claim under 42 U.S.C. § 1983, however, presents neither facts nor claims pending before the Superior Court.

In *Woodford v. Community Action Agency of Greene County*, the Second Circuit found there was no risk of piecemeal adjudication or duplicative proceedings because the plaintiff's state and federal actions did not present identical claims or "identical issues." 239 F.3d at 524. In that case, the plaintiff's state law claim of battery required her to show physical contact, whereas her federal law claims of sexual harassment, retaliation, and gender discrimination in violation of Title VII of the Age Discrimination in Employment Act did not. For similar reasons, the claims in the State Case and this action do not present a significant risk of piecemeal adjudication or duplicative proceedings.

In any event, the doctrine of res judicata may eliminate any unnecessary redundancies. *See Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) (explaining that under the doctrine of res judicata, "once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties . . . concerning 'the transaction, or series of connected transactions, out of which the first action arose.'") (alteration adopted) (citation omitted). Although Mr. Longo and Mr. Carman are not defendants in the State Case, the claims against them will require federal resolution regardless of the outcome in the State Case. Therefore, abstention by this court will not reduce the likelihood of piecemeal litigation. *See SST Glob. Tech., LLC v. Chapman*, 270 F. Supp. 2d 444, 466 (S.D.N.Y. 2003) ("[T]he claims against [a] defendant [who is not a party in the state case] may not be resolved in the state

19

case and will likely require federal resolution regardless of the outcome in the state case; abstention by this [c]ourt may not, therefore, reduce the likelihood of piecemeal litigation."). This factor therefore weighs against abstention.

### 4. The Order in Which Proceedings Were Filed and Advancement in the Fora.

The court must consider "the order in which jurisdiction was obtained." *Niagara Mohawk Power Corp.*, 673 F.3d at 102. "This factor does not turn exclusively on the sequence in which the cases were filed, 'but rather in terms of how much progress has been made in the two actions.'" *Welch's*, 170 F.3d at 122 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 21).

The State Case was filed on November 10, 2022, approximately two and a half years before this action was filed on April 14, 2025. The State Case is still in the discovery phase, and although Defendants claim it "is nearing the close of discovery" and "will soon reach the trial stage[,]" (Doc. 12 at 14), Defendants do not provide any specific deadlines. More than a year ago, on April 25, 2024, the Superior Court itself noted the slow pace of the State Case: "This case seems to be taking time and effort from all parties out of proportion to the underlying claims." (Doc. 12-10 at 1.) Although the State Case has progressed further than this case, it is not trial ready. *See Colo. River*, 424 U.S. at 820 (finding that "the apparent absence of any proceedings in the [d]istrict [c]ourt, other than the filing of the complaint, prior to the motion to dismiss," weighed in favor of abstention). For this reason, this factor only weighs slightly in favor of abstention.

### 5. The Presence of Federal Issues.

"'When the applicable substantive law is federal, abstention is disfavored,' and, indeed, even 'the absence of federal issues does not strongly advise dismissal, unless the state law issues are novel or particularly complex.'" *Niagara Mohawk Power Corp.*, 673 F.3d at 102 (quoting *Welch's*, 170 F.3d at 123-24); *see also Moses H. Cone Mem'l Hosp.*, 460 U.S. at 26 ("Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender, . . . the presence of federal-law issues must always

20

be a major consideration weighing against surrender.") (internal citations omitted). Defendants correctly assert that Plaintiffs' claim for violation of the First Amendment under § 1983 can be brought in state court. *See Williams v. State*, 589 A.2d 840, 843-44 (Vt. 1990). However, the ability to bring the claim in state court does not weigh in favor of abstention because it remains a claim brought under federal law. *See Niagara Mohawk Power Corp.*, 673 F.3d at 102 (finding the presence of the plaintiff's constitutional claims which "[arose] under both the federal and [state] constitutions" weighed against abstention).

Plaintiffs' claim for trespass to chattels in this action is a state law claim, but it is not "novel or particularly complex." *Id.* at 102 (internal quotation marks and citation omitted). Because this action involves a federal constitutional claim, which "must always be a major consideration weighing against [abstention][,]" *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 26, this factor weighs heavily against abstention.

### 6.    The Adequacy of State Court Procedures to Protect Plaintiffs' Federal Rights.

"In analyzing the sixth factor in the special circumstances test, federal courts are to determine whether the 'parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties.'" *Welch's*, 170 F.3d at 124 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28). "If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal[.]" *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 28. "[T]his factor is significant only if it militates in favor of federal jurisdiction." *Zemsky v. City of N.Y.*, 821 F.2d 148, 153 (2d Cir. 1987) (citing *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 328 (2d Cir. 1986)). In other words, "the ability of [a] state court to adequately protect [a p]laintiff's interests only makes this factor neutral." *Dalzell Mgmt. Co. v. Bardonia Plaza, LLC*, 923 F. Supp. 2d 590, 602 (S.D.N.Y. 2013) (citation omitted); *see also Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 169 (S.D.N.Y. 2006) ("Although any possible inadequacy of the state forum to protect the federal plaintiff's rights would provide a strong reason to exercise federal jurisdiction, the adequacy of the state forum

does not weigh heavily in favor of dismissal pursuant to *Colorado River*.") (internal quotation marks and citations omitted).

Here, the State Case will not resolve the claims in this action; the two cases involve different issues, parties, and causes of action; and "the state proceeding might not adequately protect [Plaintiff]'s rights against those individuals who are parties only to the federal proceeding." *Zemsky*, 821 F.2d at 153 (citation omitted). This factor therefore weighs heavily against abstention.

### 7.    Weighing the Factors

Under *Colorado River*, the court's task "is not to determine whether there is some substantial reason for the exercise of federal jurisdiction; rather, [the court] must ascertain whether there exist exceptional circumstances that justify the surrender of federal court jurisdiction." *Welch's*, 170 F.3d at 124. Factors one, two, three, five, and six weigh against abstention. Factor four weighs in favor of abstention. On balance, Defendants have failed to establish "exceptional circumstances" warranting abstention. *Colo. River*, 424 U.S. at 813; *see also Zemsky*, 821 F.2d at 153 (concluding abstention was inappropriate where the first, second, third, and fifth factors weighed against abstention, the sixth factor was neutral, and the fourth factor weighed in favor of abstention).

Because Defendants have not satisfied their burden of demonstrating that this action falls within the "narrow and specific limits" of the *Colorado River* doctrine, *Dittmer*, 146 F.3d at 116 (internal quotation marks and citation omitted), the Defendants' motion for abstention is DENIED.

### C.    Whether the Court Should Stay this Action Pursuant to its Inherent Authority.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). As a result, "[t]he decision whether to issue a stay is . . . firmly within a district court's

22

discretion." *Delgado v. NJ Transit Rail Operations, Inc.*, 329 F.R.D. 506, 507 (S.D.N.Y. 2019) (internal quotation marks omitted). Courts in the Second Circuit consider the following factors when deciding whether to issue a stay:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Id.* at 508 (quoting *Catskill Mountains Chapter of Trout Unlimited, Inc. v. U.S. E.P.A.*, 630 F. Supp. 2d 295, 304 (S.D.N.Y. 2009)). The interests of the courts include "comity" and "judicial efficiency[.]" *Van Wagner Enters., LLC v. Brown*, 367 F. Supp. 2d 530, 531 (S.D.N.Y. 2005) (internal quotation marks and citation omitted).

Although some circuits have held that "the *Colorado River* factors [exclusively] control whether a stay can issue in favor of parallel state proceedings[,]" *Ernest Bock, LLC v. Steelman*, 76 F.4th 827, 843 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 554 (2024), the Second Circuit has acknowledged a federal court's inherent authority to stay a case. *See Giulini v. Blessing*, 654 F.2d 189, 193 (2d Cir. 1981) (concluding that *Colorado River* doctrine did not require stay but stay pursuant to court's inherent authority was appropriate). District courts in the Second Circuit have followed this practice.[7]

Abstention may be granted where "the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Cnty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959). This type of abstention is "unrelated to considerations of proper constitutional adjudication" and rests on "considerations of wise judicial administration[.]" *Colo. River*, 424 U.S. at 817 (alteration, internal quotation

---

[7] *See, e.g., Lafont v. Phillip*, 2022 WL 2132992, at *7 (E.D.N.Y. June 14, 2022) ("Even if a court does not abstain by dismissal under *Colorado River*, a court may nevertheless exercise its discretion and stay an action pending a state court decision[.]"); *Windward Bora, LLC v. Bank of New York Mellon as Tr. for Certificateholders of Cwalt, Inc., Alt. Loan Tr. 2007-5CB, Mortg. Pass-Through Certificates, Series 2007-5CB*, 2020 WL 7042761, at *7 (E.D.N.Y. Nov. 30, 2020) (same); *Glenclova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292, 313-14 (S.D.N.Y. 2012) (concluding that abstention under *Colorado River* was not appropriate but staying case in favor of state court litigation); *Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 2011 WL 13261585, at *2 (S.D.N.Y. Nov. 3, 2011) (same).

marks, and citation omitted). Even though "the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention[,]" those circumstances, "though exceptional, do nevertheless exist." *Id.* at 818.

In *Giulini*, the Second Circuit approved of a stay "pending a decision by the state court, with a view to avoiding wasteful duplication of judicial resources and having the benefit of the state court's views." 654 F.2d at 193. Defendants in the case at bar assert that "the parties are nearing trial" and request that "this [c]ourt stay this action under its inherent power until the [State Case] reaches its conclusion." (Doc. 12 at 21-22.) It is unknown if and when the State Case will proceed to trial as no trial date has been set.

Defendants' arguments for a stay pursuant to the court's inherent authority largely mirror its arguments for abstention, although they assert that "concurrent litigation also presents the risk of parallel litigation on non-merits matters, such as discovery disputes[,]" and that "Plaintiffs will simply get a second chance to obtain discovery that the Superior Court declined to require the custodian of such records to produce." (Doc. 12 at 19.) Without abstaining, Defendants remain free to bring the Superior Court's discovery rulings to this court's attention, but because the claims are different, the scope and nature of the discovery in the two cases is likely also to be different.

For the same reasons that it denied abstention, the court finds a stay is not clearly warranted, may delay the adjudication of this case, and would be a *de facto* abstention. The court therefore declines to exercise its inherent authority to stay this action pending final resolution of the State Case.

## CONCLUSION

For the reasons stated above, the court DENIES Defendants' motion to dismiss or stay. (Doc. 12.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 20th day of November, 2025.

Christina Reiss, Chief Judge
United States District Court